UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EILEEN GRADY,<br><br>      Plaintiff,<br><br>v.<br><br>WAREHAM POLICE DEPARTMENT,<br>TOWN OF WAREHAM,<br>THOMAS JOYCE (individually), and<br>MICHAEL J. HARTMAN (individually),<br><br>      Defendants. | CIVIL ACTION NO.<br>05-10097 |

## AMENDED COMPLAINT AND JURY DEMAND

### Introduction

Plaintiff Eileen Grady (formerly Eileen Hinckley) brings this action against her employer Wareham Police Department ("the Department"), the Town of Wareham ("the Town") and certain individual defendants, alleging, among other things, discrimination on the basis of sex and retaliation.  She claims (a) violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq., as amended in 1991, and the Massachusetts Fair Employment Practices Law, M.G.L. c. 151B, §§ 4(1) & 4(4); (b) interference in violation of M.G.L. c. 151B § 4(4A); (c) aiding, abetting, inciting, compelling and/or coercion in violation of M.G.L. c. 151B § 4(5); and (d) tortious interference with contractual/advatagous employment relations.

### Jurisdiction

1.   This Court has federal question jurisdiction and supplemental jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

### Procedural Background

2.   Plaintiff Grady timely filed her Charges of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC"), and has met the administrative prerequisites to filing suit under Title VII and Chapter 151B.

**Parties**

3. Plaintiff Eileen Grady ("Grady" or "Plaintiff") is an adult female who resides in Bourne, Barnstable County, Massachusetts. She is, and at all relevant times, was an employee of the Defendant Wareham Police Department and the Defendant Town of Wareham.

4. Defendant Wareham Police Department is, and was at all times relevant hereto, located in Wareham, Plymouth County, Massachusetts.

5. Defendant Town of Wareham is in Plymouth County, Massachusetts.

6. Defendant Thomas Joyce ("Joyce") is an adult male who resides in Wareham, Plymouth County, Massachusetts. Joyce is the Chief of the Wareham Police Department.

7. Defendant Michael A. Hartman ("Hartman") is an adult male who resides in Mansfield, Bristol County, Massachusetts. Hartman is the Town Administrator for the Town of Wareham.

**Facts**

8. Grady began her law enforcement career in 1985 when the Wareham Police Department ("the Department") hired her as a Patrol Officer after she graduated from the state training center with the 5th highest academic ranking.

9. Grady was the first female officer to be hired full time by the Department.

10. In her near eighteen years with the department, Grady, despite being subjected to adverse treatment because of her sex, has performed well as an officer and leader and obtained numerous accomplishments.

11. From 1985 through 1996 she served as a Patrol Officer with responsibility for, among other things, investigating complaints, making arrests and providing court testimony. During this time, she also had several additional collateral duties, including serving as a Sexual Assault Investigator, Honor Guard, School Safety Officer and Drug Abuse Resistance Education Officer.

12. As a Patrol Officer she received positive performance evaluations with ratings between a "4" and a "6" out of a rating scale of "1" to "7."

13. In 1996, she was promoted to the position of Sergeant, and had responsibility for,

2

among other things, supervising a minimum of five patrol officers and two dispatchers during the evening shift.  As Sergeant, Grady performed well.

14. While working full time as a Patrol Officer and later as Sergeant, Grady pursued degrees in criminal justice.  Grady obtained her Bachelor of Science in Criminal Justice from Bridgewater State College in 1994, and her Master of Science in Criminal Justice from Western New England College in 2000.

15. Grady also received numerous training certificates in specific areas.  For example, in 1996, Grady completed a Command Training Program at the New England Institute of Law Enforcement Management.   As another example, in 1999 Grady completed a training on Terrorism Awareness at the Federal Emergency Management Agency.

16. Throughout her tenure with the Department, Grady was commended by the Department for her positive relations with the community.   Indeed, Grady received a number of awards from various community organizations, including a Public Safety Award in 1988 from the Wareham Kiwanis Club, an Outstanding Community Service Award in 1990 from the Plymouth County Education Association, a Woman of the Year Award in 1992 from the Wareham Business and Professional Women's Club, and an Outstanding Service Award in 1992 and 1993 from the Plymouth County District Attorney.

17. Grady also consistently performed exceptionally well on police civil service examinations throughout her career.  For example, she obtained a perfect score of 100 on her entry-level civil service exam.

18. Despite her above-stated accomplishments and successes, Grady was treated less favorably than her male peers based upon gender stereotypes, and was subjected to discriminatory treatment because of her sex.

19. As a result of this discrimination, male officers rose through the ranks in the Department more rapidly than did Grady.

20. For example, when she began in 1985 with the Department Grady was placed on desk

duty while her male academy classmate, Kevin Walsh, was immediately assigned to patrol. Male patrol officers told her that someone was likely to get hurt if she was on the road.

21. After demanding equal treatment, Grady was given sporadic and unstructured training at night. She was then assigned to patrol, but was placed on the day shift while several of her male peers (some of whom started with the Department years after her, including Donald Bliss who started with the Department in 1987) were immediately assigned to the night shift.

22. When Grady first started with patrol, one of her supervisors, Sergeant Wayne Dudley, told her, "You don't belong here. I don't want you. I don't have time to baby-sit," or words to that effect. Sergeant Dudley would also frequently make sexually offensive comments to her.

23. In approximately 1990, there was an opening for the position of Sergeant.

24. Throughout the history of the Department, the Department's practice was to promote the candidates with the higher scores on the promotional civil service exam.

25. Grady applied for the position and earned the second-highest score on the civil service exam determining promotions to the position of Sergeant.

26. Chief Thomas Joyce, deviating from the Department's practice of promoting candidates with the higher scores, chose to bypass Grady, citing her lack of night experience, and instead promoted the third highest scorer, Glenn Gifford. (Shortly thereafter, the highest scoring examinee, Jeff Perry, was also promoted to Sergeant.) Grady immediately requested and was granted reassignment to the night shift.

27. In approximately 1992, a Sergeant position again became available within the Department. Despite the fact that Grady's name was at the top of the list, and she now had night experience, she still was not promoted.

28. Instead, Chief Joyce ordered the administering of a new exam, claiming he had allegedly "forgotten" about the existing list.

29. Grady took the new exam in approximately 1992, scoring fourth highest, and two males scoring ahead of her were promoted to Sergeant in approximately 1992 and 1993 respectively (including Donald Bliss in approximately 1993).

30. In approximately 1994, a Detective position became available. Grady applied for the position, but Chief Joyce decided to appoint a male patrol officer, Preston Urquhart, to the Detective position. Preston Urquhart started with the Department in approximately 1988, and had less experience and less seniority than Grady.

31. In approximately 1996, another Sergeant position became available, and, after a male officer who was third on the list declined the position, the Department finally promoted Grady to the position of Sergeant.

32. Thereafter, Chief Joyce subjected Grady to demeaning treatment at Sergeant meetings, which were often attended by Chief Joyce, and almost always attended by the Department's Captain, the Lieutenant to whom Grady reported and by all Sergeants in the Department.

33. For example, when Chief Joyce would use words that were mildly offensive at best (e.g., "damn") at such meetings, he would sometimes cover Grady's ears with his hands.

34. Other times, Chief Joyce would look directly at Grady after using mildly offensive words and say in a patronizing tone, "Pardon my French young lady," or words to that effect. Grady (born July 31, 1954) was in her forties at the time Chief Joyce would make these comments.

35. Thus, Grady was singled out in front of her peers and superiors, and embarrassed by the highest-ranking officer in the Department, because of her sex.

36. Despite this adverse treatment, Grady worked hard and received a positive performance review in 1999 from her superiors, Captain Paul Cardalino and Lieutenant Arthur Brightman, regarding her performance as a Sergeant.

37. In her review, she was commended for, among other things, her leadership and supervision abilities.

38. In addition, during Grady's tenure as Sergeant three separate murders occurred while she was on duty as shift supervisor of several patrol officers. Her leadership, judgment and decision-making contributed to her shift's efficient response and execution of proper procedures. Suspects were arrested in all three murders.

39. In or about July 2001, a Lieutenant position became available in the Department and

there were three candidates for the position: Grady, Detective Sergeant Donald Bliss, and Sergeant Glen Gifford.

40. Throughout the history of the Department, the practice had been that the candidate with the highest score on the Lieutenant promotional civil service exam was promoted.

41. However, knowing full well that Grady had a reputation for scoring high on civil service exams, in July 2001 Chief Joyce announced an unprecedented multi-faceted selection process for promoting Sergeants and Lieutenants. The factors included a promotional test score, a Department interview, a review of performance and personnel records, and an evaluation conducted by an outside assessment center.

42. This was the first and last time that this "multi-faceted" selection process was used.

43. On October 20, 2001, Grady sat for the Lieutenant promotional exam along with the other candidates, and on December 17, 2001 the exam results were announced. Grady obtained the highest score of 88, which far exceeded those of the other candidates. Glen Gifford obtained the second-highest score of 78, and Donald Bliss obtained the third-highest score of 75.

44. Nearly two years later, on August 28th and 29th of 2003, the other candidates for the Lieutenant position and Grady underwent an evaluation by an assessment center that was almost entirely subjective.

45. The evaluation was conducted by the BadgeQuest Assessment Center, which used three male assessors (Chief William Chase, Chief Lincoln Miller and Chief Gary Russell), and was coordinated by another male, Chief Stephen Unsworth.

46. As part of the BadgeQuest process, Chief Joyce appointed two of the assessors. Of the two assessors chosen by Chief Joyce, one was Chief Miller of the Marion Police Department.

47. Chief Miller's department has never had a female officer. Further, Chief Miller is a longtime friend of Chief Joyce (Chief Joyce served as the best man in both of Chief Miller's weddings).

48. Although the assessors were charged with evaluating the candidates, the ultimate

selection was made by Chief Joyce, which was then approved by the Town of Wareham's Town Administrator, Michael J. Hartman.

49. The evaluation conducted on August 28th, 2003 was a writing exercise.

50. The evaluation conducted on August 29th, 2003 was a series of four exercises, followed by an oral interview, all conducted by and in the presence of the assessors.  For example, the first exercise given on August 29th, 2003, required that Grady respond to a mock citizen complaint in the presence of the assessors.  In addition, on August 29th, 2003, during "down time" the other candidates and Grady were given a second writing exercise that was evaluated by Chief Joyce.

51. Approximately one week after August 29, 2003, the other candidates and Grady were individually interviewed by Chief Joyce.  During the interview, Grady told Chief Joyce that she was also interested in the (higher-paid) Detective Sergeant position currently held by Donald Bliss should that position become available if she was bypassed and Donald Bliss was promoted to Lieutenant.

52. On or about September 24, 2003, Chief Joyce notified Grady of the Department's selection for promotion to Lieutenant.  Despite the considerable gap between the civil service exam scores of herself and Donald Bliss and the considerable gap in their education levels (Grady has a Masters Degree while Donald Bliss has an Associates Degree), the Department bypassed Grady and instead promoted Donald Bliss.

53. As its purported reason for the bypass decision, the Department stated vaguely that Grady "did not fare well in the categories of Leadership, Judgment and Decision Making," despite the fact that her overall BadgeQuest score of 7.4 (which included Leadership, Judgment and Decision Making) qualified for the above-average rating of "Very Good."  Further, the afore-mentioned highest civil service exam score of 88 covered the skill areas of leadership, judgment and decision-making.

54. The Department also stated vaguely that, in both the writing exercise and oral interview, Grady allegedly did not provide suggestions to solve identified problems, despite the fact that she obtained the highest score on the writing exercise conducted on August 28, 2003.

7

55. Not only did the Department depart from its past practice of promoting the candidate with the highest score on the promotional civil service exam, but the "reasons" given for failing to promote Grady are false, inconsistent with her past performance evaluation and accomplishments on the job, and based upon an evaluation process that was largely subjective.

56. Further, the Department's history of failing to promote female officers and/or failing to give more-desired assignments to female officers further suggest that the decision was gender based.  The Department currently has four females on the roster of approximately forty-three officers.  Similar to Grady, other female officers have been bypassed for promotions and/or more-desired assignments over less-qualified males.

57. In approximately 1992, one of the other three female officers, Mary Walker, filed a charge of gender discrimination at the MCAD.  The matter was ultimately resolved in Officer Walker's favor.

58. Not only was Grady not promoted to Lieutenant, but she was not even considered for the Detective Sergeant position that was formerly held by Donald Bliss.  Despite her qualifications and expressed interest in the (higher-paid) Detective Sergeant position, in approximately October 2003, Chief Joyce instead assigned a male, Bradford Bulger, to the position.

59. In December of 2003 and March of 2004, in an attempt to resolve Grady's concerns, Grady's attorney complained on her behalf of sex discrimination to Chief Joyce and the Department's attorney, respectively.  Corrective action was not taken.

60. On June 14, 2004, Grady timely filed a Charge of Discrimination with the MCAD and the EEOC alleging discrimination based on sex.

61. On September 21, 2004 the MCAD allowed Grady's request to withdrew her Charge of Discrimination from the MCAD to pursue a civil action.  On November 8, 2004, Grady obtained a Right to Sue Letter from the EEOC.

62. On or about January 14, 2005, Grady filed this action asserting claims of sex discrimination in employment in violation of G.L. c. 151B and Title VII against the Defendants.

63. On or about January 29, 2005 and thereafter, this lawsuit was reported in the local newspapers.

64. On or about February 1st and 2nd of 2005, the Defendants were served with the complaint in this action.

65. Shortly after Grady took steps to pursue her claims in court, the Defendants began retaliating against her.  Among other things, on or about November 11, 2004, she received a written reprimand dated November 1, 2004 from Lieutenant Bliss (cc'd to Chief Joyce) regarding an unsecured weapon without first being spoken to about the issue (which is the usual practice and/or procedure at the Department).  Also, other Sergeants (who have not asserted claims of discrimination) were not similarly reprimanded for similar incidents.

66. In a memorandum dated February 4, 2005 to Lieutenant Bliss (cc'd to Chief Joyce), Grady raised concerns of retaliation and sex discrimination with regard to the November 1, 2004 written reprimand.  Shortly thereafter, under the guise of seeking to "investigate" her concerns, Chief Joyce wrote Grady a memorandum dated February 12, 2005 regarding Grady's February 4, 2005 memorandum that was accusatory in tone and intimidating.

67. Thereafter, the combination of Grady pursuing discrimination claims in court and raising concerns of retaliation resulted in further (and more intensified) retaliation against her.  For example, on or about March 10, 2005, Grady was suspended from duty without pay by Chief Joyce regarding her approval of a subordinate's police report that contained spelling and/or grammar errors and that Chief Joyce alleged was not sufficiently detailed.  Not only has Grady never been suspended from duty (excluding detail) in her near twenty years with the Department, but throughout the history of the Department no officer has been suspended for similar reasons (i.e., approval of a subordinate's report containing spelling and/or grammar errors, or lacking sufficient detail).

68. Around the time of her suspension, Chief Joyce began calling patrol officers (including officers who report directly to Grady) into his office to ask them a list of questions, including "Which Sergeant is your favorite?" and "Which Sergeant is the worst?," or questions to that effect,

9

in an obvious attempt to gain allegiance from patrol officers with regard to Grady's sex discrimination claims.

69. In addition, on or about March 18, 2005, Chief Joyce called one of the patrol officers into his office and told her that Grady was suspended from duty not for spelling errors, but for "incompetence" when this officer had no need to know such information. Grady has learned from other patrol officers (who report directly to Grady) that Chief Joyce also spoke with them about her suspension when these officers had no need to know such information.

70. As a result of the above-stated discrimination and retaliation, Grady has sustained damages, including but not limited to, lost wages, less-favorable and/or lost benefits, and emotional distress.

## COUNT I
## TITLE VII - SEX DISCRIMINATION
## (Against Department and Town)

71. Grady realleges and incorporates paragraphs 1 through 70 above as if fully set forth herein.

72. The Defendants have discriminated, and continue to discriminate against Grady, in the terms, conditions and privileges of her employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §!2000e-1 et. seq., by, among other things, denying her advancement opportunities and/or failing to promote her and/or failing to provide her with higher paid assignments because of her sex.

73. As a direct and proximate result thereof, Grady has suffered and continues to suffer damages, including but not limited to loss of income, loss of employment benefits, and emotional distress.

## COUNT II
## M.G.L. c. 151B, § 4(1) - SEX DISCRIMINATION
## (Against Department and Town)

74. Plaintiff Grady realleges and incorporates paragraphs 1 through 70 above, as if fully set forth herein.

75. The Defendants have discriminated, and continue to discriminate against Grady, in the

terms, conditions and privileges of her employment in violation of the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B, § 4(1), by, among other things, denying her advancement opportunities and/or failing to promote her and/or failing to provide her with higher paid assignments because of her sex.

76. As a direct and proximate result thereof, Grady has suffered and continues to suffer damages, including but not limited to loss of income, loss of employment benefits, and emotional distress.

### COUNT III
### TITLE VII - RETALIATION
### (Against Department and Town)

77. Plaintiff Grady realleges and incorporates paragraphs 1 through 70 above, as if fully set forth herein.

78. The Defendants have retaliated, and continue to retaliate against Grady, in the terms, conditions and privileges of her employment in violation of Title VII, 42 U.S.C. § 2000e(3), by, among other things, disciplining her more harshly than officers who have not engaged in protected activity for similar performance issues, attempting to gain allegiance from patrol officers with regard to Grady's sex discrimination claims, and undermining and damaging Grady's authority and reputation with patrol officers.

79. As a direct and proximate result thereof, Grady has suffered and continues to suffer damages, including but not limited to loss of income, loss of employment benefits, and emotional distress.

### COUNT IV
### G.L. c. 151B, §4(4) - RETALIATION
### (Against Department, Town and Joyce)

80. Plaintiff Grady realleges and incorporates paragraphs 1 through 70 above, as if fully set forth herein.

81. The Defendants have retaliated, and continue to retaliate against Grady, in the

terms, conditions and privileges of her employment in violation of G.L. c. 151B, § 4(4), by, among other things, disciplining her more harshly than officers who have not engaged in protected activity for similar performance issues, attempting to gain allegiance from patrol officers with regard to Grady's sex discrimination claims, and undermining and damaging Grady's authority and reputation with patrol officers.

82. As a direct and proximate result thereof, Grady has suffered and continues to suffer damages, including but not limited to loss of income, loss of employment benefits, and emotional distress.

## COUNT V
## M.G.L. c. 151B, § 4(4A) - INTERFERENCE
### (Against All Defendants)

83. Grady realleges and incorporates paragraphs 1 through 70 above as if fully set forth herein.

84. By interfering with Grady's exercise or enjoyment of her right to be free of discrimination on the basis of sex and retaliation, the Defendants have violated the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B, § 4(4A).

85. As a direct and proximate result, Grady has suffered and continues to suffer damages, including but not limited to loss of income, loss of employment benefits, and emotional distress.

## COUNT VI
## M.G.L. c. 151B, § 4(5) – AIDING, ABETTING, INCITING, COMPELLING AND/OR COERCION
### (Against Joyce and Hartman)

86. Grady realleges and incorporates paragraphs 1 through 70 above as if fully set forth herein.

87. By aiding, abetting, inciting, compelling or coercing violations of M.G.L. c. 151B § 4(1) against Grady, Joyce and Hartman have violated the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B, § 4(5).

88. As a direct and proximate result, Grady has suffered and continues to suffer damages,

including but not limited to loss of income, loss of employment benefits, and emotional distress.

## COUNT VII
## TORTIOUS INTERFERENCE WITH CONTRACTUAL/ADVANTAGEOUS EMPLOYMENT RELATIONS
### (Against Joyce and Hartman)

89. Grady realleges and incorporates paragraphs 1 through 70 above as if fully set forth herein.

90. Grady has a contractual and/or advantageous employment relationship with the Department and Town.

91. The individual Defendants were and are aware of Grady's existing or prospective contractual/advantageous employment relationships, set forth above.

92. The individual Defendants, with improper motive and/or through the use of improper means, intentionally interfered with Grady's contractual/advantageous employment relationships.

93. As a direct and proximate result, Grady suffered and continues to suffer damages including but not limited to, loss of income, loss of employment benefits, and emotional distress.

WHEREFORE, Grady requests that this Court:

1. Award Grady injunctive relief, including but not limited to, ordering the Defendants Wareham Police Department and Town of Wareham to promote Grady to the position of Lieutenant;

2. Award Grady damages for her lost wages and lost benefits plus interest;

3. Award Grady damages for her emotional distress;

4. Award Grady punitive damages;

5. Award Grady reasonable attorneys' fees and costs; and

6. Grant such further relief as the Court deems just and proper.

## JURY TRIAL CLAIM

Plaintiff hereby requests trial by jury on all claims so triable.

                                      Respectfully Submitted,

                                      EILEEN GRADY
                                      By her attorneys,

                                      /s/ Barbara A. Robb
                                      Lawrence J. Casey (BBO #555766)
                                      Barbara A. Robb (BBO #639976)
                                      Perkins Smith & Cohen LLP
                                      One Beacon Street, 30th Floor
                                      Boston, MA  02108
DATED:  May 31, 2005.              617-854-4000